**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **ESTATE OF DERRICK DWAYNE GLENN, by and through KAYLA GLENN and DENIAH GLENN; KAYLA GLENN, Individually; DENIAH GLENN, Individually; and PATRICIA GLENN, Individually,** | § § § § § § | |
| | § | **CIVIL ACTION NO.** |
| **Plaintiffs,** | § | **3:26-cv-00381** |
| | § | |
| **v.** | § | **JURY DEMANDED** |
| | § | |
| **CITY OF TEXAS CITY, TEXAS; JEFFREY ADAMS, in his individual capacity; TAIDE PINEDA, in his individual capacity; JOHN PICARD, in his individual capacity; HUNTER STEWART, in his individual capacity; ROBERT LIZIK, in his individual capacity; and LANDIS CRAVENS, in his individual capacity,** | § § § § § § § § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

COMES NOW Plaintiffs the Estate of Derrick Dwayne Glenn, by and through Kayla Glenn and Deniah Glenn; Kayla Glenn, Individually; Deniah Glenn, Individually; and Patricia Glenn, Individually (collectively, "Plaintiffs"), and for their Original Complaint against Defendants City of Texas City, Texas; Jeffrey Adams, in his individual capacity; Taide Pineda, in his individual capacity; John Picard, in his individual capacity; Hunter Stewart, in his individual capacity; Robert Lizik, in his

individual capacity; and Landis Cravens, in his individual capacity (collectively, "Defendants"), respectfully show the Court as follows:

## I. INTRODUCTION

1. This is a civil action under 42 U.S.C. § 1983 for the death of Derrick Dwayne Glenn, who died on Tuesday, December 10, 2024, in the custody of the Texas City Police Department ("TCPD") after a pedestrian stop in the 400 block of Oak Street North, Texas City, Texas.

2. TCPD Officer Jeffrey Adams stopped Mr. Glenn as he walked along a roadway with no sidewalk, on the left side of the road facing oncoming traffic. Adams ordered Mr. Glenn to the ground at Taser point, handcuffed him, and asked what he had swallowed. Mr. Glenn did not answer and never spoke again.

3. Over the next fourteen minutes, five TCPD officers observed Mr. Glenn, handcuffed and then unrestrained, go from labored breathing to unconsciousness to breathing that the officers themselves described as "faint" and "barely." Each officer knew that Mr. Glenn had put something in his mouth moments before his breathing changed. No officer looked into his airway, attempted to clear it, or attempted resuscitation. When paramedics finally attempted to intubate Mr. Glenn, they found a plastic bag lodged in his larynx and removed it. He was pronounced dead at 12:12 p.m.

4. The Galveston County Medical Examiner determined that Mr. Glenn died of mechanical obstruction of the airway by a foreign body, with no significant traumatic injury and no natural disease.

5. Forty-three days earlier, on October 28, 2024, another man, Rego Berto Ornelas Jr., died in TCPD custody after officers, supervised by the same sergeant who supervised the scene of Mr. Glenn's death, transported him to jail rather than to a hospital and never summoned emergency medical services. The Galveston County Medical Examiner determined that Mr. Ornelas died of toxic effects of methamphetamine.

6. More than four years before Mr. Ornelas's death, on February 11, 2020, Raven Vaughn died of acute methamphetamine toxicity after a day in the Texas City Jail. TCPD jail personnel recorded that he was shaking and sweating profusely at 12:53 p.m. and again at 1:23 p.m., found him unresponsive at 1:48 p.m., and requested emergency medical services at that time. Galveston County Medical Examiner Case No. ME-01-2020-086. Three people died in TCPD custody between February 2020 and December 2024.

7. A separate action arising from Mr. Ornelas's death, *Estate of Rego Berto Ornelas Jr., et al. v. City of Texas City, Texas, et al.*, Civil Action No. 3:26-cv-00376, is pending in the Galveston Division of this Court. The two actions arise from the same police department, involve a common supervising officer, Defendant Picard, and common defendants, the City of Texas City and Chief Cravens, and are identified as related cases on the Civil Cover Sheet and in the *Notice of Related Case* filed with this Complaint.

8. Plaintiffs bring claims under the Fourth and Fourteenth Amendments to the United States Constitution against the individual officers, against Chief of Police Landis

Cravens, and against the City of Texas City, and seek the damages available to Mr. Glenn's estate and to his statutory wrongful death beneficiaries under 42 U.S.C. §§ 1983 and 1988.

9. Where this Complaint pleads alternative theories, it does so under Federal Rule of Civil Procedure 8(d), and no allegation in one count is an admission against another.

## II. JURISDICTION AND VENUE

10. This action arises under the Constitution and laws of the United States, including the Fourth and Fourteenth Amendments and 42 U.S.C. §§ 1983 and 1988. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

11. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in Galveston County, Texas, and under § 1391(b)(1) because Defendant City of Texas City is located in this district and, on information and belief, each individual Defendant resides in this district.

12. Venue is proper in the Galveston Division because the events giving rise to this action occurred in Texas City, Galveston County, Texas.

## III. PARTIES

13. Plaintiff Estate of Derrick Dwayne Glenn brings this action by and through Kayla Glenn and Deniah Glenn, the surviving children of Derrick Dwayne Glenn, deceased.

14. Plaintiff Kayla Glenn is an individual residing in Texas. She is a surviving daughter of Derrick Dwayne Glenn and sues individually.

15. Plaintiff Deniah Glenn is an individual residing in Texas. She is a surviving daughter of Derrick Dwayne Glenn and sues individually.

16. Plaintiff Patricia Glenn is an individual residing in Galveston County, Texas. She is the mother of Derrick Dwayne Glenn, deceased, and sues individually as a surviving parent.

17. Defendant City of Texas City, Texas (the "City") is a home-rule municipal corporation organized under the laws of the State of Texas and located in Galveston County. The City may be served with process through its Mayor, Abel Garza Jr., or its City Secretary, at 1801 9th Avenue North, Texas City, Texas 77590.

18. Defendant Jeffrey Adams is an individual residing in Texas. At all relevant times he was a police officer employed by TCPD. He is sued in his individual capacity and may be served at the Texas City Police Department, 1004 9th Avenue North, Texas City, Texas 77590, or wherever he may be found.

19. Defendant Taide Pineda is an individual residing in Texas. At all relevant times he was a police officer employed by TCPD. He is sued in his individual capacity and may be served at the Texas City Police Department, 1004 9th Avenue North, Texas City, Texas 77590, or wherever he may be found.

20. Defendant John Picard is an individual residing in Texas. At all relevant times he was a sergeant employed by TCPD. He is sued in his individual capacity and may

be served at the Texas City Police Department, 1004 9th Avenue North, Texas City, Texas 77590, or wherever he may be found.

21. Defendant Hunter Stewart is an individual residing in Texas. At all relevant times he was a police officer employed by TCPD. He is sued in his individual capacity and may be served at the Texas City Police Department, 1004 9th Avenue North, Texas City, Texas 77590, or wherever he may be found.

22. Defendant Robert Lizik is an individual residing in Texas. At all relevant times he was a police officer employed by TCPD. He is sued in his individual capacity and may be served at the Texas City Police Department, 1004 9th Avenue North, Texas City, Texas 77590, or wherever he may be found.

23. Defendant Landis Cravens is an individual residing in Texas. At all relevant times he was the Chief of Police of the City of Texas City. He is sued in his individual capacity and may be served at the Texas City Police Department, 1004 9th Avenue North, Texas City, Texas 77590, or wherever he may be found.

## IV. FACTUAL ALLEGATIONS

### *A. The Stop*

24. The 400 block of Oak Street North in Texas City is a two-lane asphalt roadway with grass shoulders on both sides and no sidewalk on either side.

25. On Tuesday, December 10, 2024, at approximately 11:29 a.m., Derrick Dwayne Glenn, age 47, was walking southbound along the east edge of Oak Street North. For a pedestrian walking southbound, the east edge is the left side of the roadway, facing northbound traffic.

26. Officer Adams was driving southbound on Oak Street North in a marked TCPD patrol unit equipped with a forward-facing Axon Fleet camera. Adams was wearing an Axon body-worn camera.

27. At 11:29:10 a.m., Adams entered a self-initiated pedestrian stop on his mobile computer terminal. TCPD dispatch recorded the event, Event ID 2024-666748, with the nature "Suspicious Circ Person," alarm level 1, priority 2, and no medical priority.

28. Adams activated his emergency lights and stopped his patrol unit in the roadway approximately 150 to 200 feet behind Mr. Glenn. The forward-facing camera recorded Mr. Glenn on the east edge of the roadway at 11:29:13 a.m. (17:29:13 UTC).

29. Adams exited his patrol unit and called out, "Hey bub, come over here for me."

30. Adams' Incident/Investigation Report, Case No. 24-008212, states that Adams stopped Mr. Glenn because he "observed the male walking on the wrong side of the roadway, as he was on the right side of the roadway (southbound lane)." The report lists the offense as "Walking on the Wrong Side of the Roadway."

31. Lieutenant B. Shives' supplemental report in the same case describes the offense as "City Ordinance Violation- Walk Wrong Side Roadway."

32. A press release issued by the TCPD Office of the Chief of Police on December 10, 2024 states that TCPD "initiated a pedestrian stop in the 400 block of Oak Street for a traffic violation."

33. Mr. Glenn was not walking on the right side of the roadway. He was walking on the left side, facing oncoming traffic, on a roadway with no sidewalk. The forward-facing camera recording from the moment Mr. Glenn comes into view until Adams initiates the stop does not show Mr. Glenn committing any traffic offense, ordinance violation, or other offense.

34. Adams' report states that after Adams exited his unit, Mr. Glenn "began walking southeast toward Andrews Street," "looked back at me, continued walking, then removed an item from his pocket and placed it inside his mouth."

35. Adams drew his department-issued Taser, activated it, pointed it at Mr. Glenn, and ordered: "Turn around right now man and get on the ground, get on the damn ground. Put your hands behind your back."

36. Mr. Glenn complied immediately. He placed himself face down on the asphalt on the east side of the roadway and extended his hands behind his back. He did not run, resist, threaten, or reach for anything. He was unarmed.

37. Adams handcuffed Mr. Glenn behind his back at approximately 11:29:35 a.m.

***B. The Restraint and the Onset of Respiratory Distress***

38. Immediately after handcuffing Mr. Glenn, Adams asked, "What did you just swallow, huh?" Mr. Glenn did not answer. He never spoke again.

39. Adams rolled Mr. Glenn onto his side, inserted his finger into Mr. Glenn's mouth, said, "I'll take that," withdrew his finger, and examined the residue on it. Adams' report states that he "was only able to locate residue and small pieces of a white

substance" in Mr. Glenn's mouth and that he "collected a small amount of the residue from his mouth on my finger."

40. Adams did not look into Mr. Glenn's throat, did not perform a finger sweep of the throat, and did not perform back blows or abdominal thrusts.

41. Adams' body-worn camera recorded Mr. Glenn making guttural sounds and heaving as he attempted to breathe. As the Medical Examiner later determined, a plastic bag was lodged in Mr. Glenn's larynx.

42. At 11:30:39 a.m., Adams radioed dispatch: "Roll EMS, male just swallowed something." Adams' report states that he requested EMS "to provide medical aid to the male for swallowing narcotics." Dispatch spawned a fire department event, Event ID 2024-666750, at 11:30:55 a.m. The police event was never reclassified as a medical call.

43. Adams then ordered Mr. Glenn, still handcuffed, to stand, and walked him to the front of the patrol unit. Adams' report states: "As I walked the male to my unit, I observed him display signs of difficulty breathing."

44. Adams sat Mr. Glenn on the ground beside the patrol unit and placed him on his side. Adams asked, "How much did you swallow man, how much. You got any weapons on you?" and, moments later, "How old are you." Mr. Glenn continued to make guttural sounds and slumped onto his side.

45. Adams searched Mr. Glenn's person and pockets, removing a cell phone and cash from the front pocket of his hoodie and a bag of charging cords and coins from his

right front pocket. Adams' report states that during this search he "noticed the male had soiled himself" and notified Sergeant Picard.

46. Mr. Glenn remained handcuffed behind his back.

***C. The Wait for EMS***

47. Officer Pineda arrived at 11:33:43 a.m. Pineda's supplemental report states that he "observed the male to be unconscious and struggling to breath," "drooling," and that he had "urinated himself." Pineda rubbed Mr. Glenn's sternum and told him to "stay awake" and "stay with us." Mr. Glenn did not respond.

48. Sergeant Picard arrived at 11:34:02 a.m. Picard's supplemental report states that on arrival he observed Mr. Glenn "on the ground, handcuffed and in the recovery position," and that Mr. Glenn was "breathing but unresponsive." Adams told Picard that Mr. Glenn had put something in his mouth, that Adams believed Mr. Glenn had ingested a narcotic, and that Mr. Glenn was having difficulty breathing.

49. Officer Stewart arrived at 11:34:06 a.m. Stewart's supplemental report states that he "observed Glenn to be unconscious and breathing." Before his arrival, Stewart heard Adams' radio request for EMS "due to someone swallowing something."

50. Officer Lizik arrived at 11:34:07 a.m. Lizik's supplemental report states that Adams had "advised a subject swallowed narcotics and needed additional officers and EMS," that on arrival Mr. Glenn "appeared to be breathing," and that Lizik "felt a faint pulse." Lizik later observed Mr. Glenn "breathing faintly" with "a slight pulse."

51. After his arrival, Picard directed that the handcuffs be removed. Stewart removed them. The officers rolled Mr. Glenn onto his back.

52. After the other officers arrived, Adams went to the rear of his patrol unit, scraped the residue from his finger into a clear evidence bag, and made a second search of Mr. Glenn's belongings for identification.

53. Picard's supplemental report states that as he "continued to observe Glenn," Mr. Glenn's breathing "got 'faint' and delayed." Adams' report states that while waiting for EMS, "the male's breathing became more shallow."

54. At 11:37:49 a.m., Pineda radioed dispatch that Mr. Glenn was unconscious and to have EMS "step it up." At 11:37:55 a.m., six seconds later, Picard radioed dispatch to have EMS "step it up."

55. Each of the five officers on scene, Adams, Pineda, Picard, Stewart, and Lizik, had heard Adams' radio report that Mr. Glenn had swallowed something, and each observed Mr. Glenn unresponsive on the ground with breathing that each described in his own report as labored, faint, shallow, or delayed.

56. From the time Mr. Glenn became unresponsive until paramedics took over his care, none of the five officers looked into Mr. Glenn's mouth or throat for the object he had swallowed; none performed back blows, abdominal thrusts, or a finger sweep of the throat; none attempted rescue breaths or chest compressions; and none took any other measure directed at the airway.

57. Picard, as the supervising sergeant on scene, did not direct any officer to examine or clear Mr. Glenn's airway or to begin resuscitation.

58. Each of the five officers held a peace officer license issued by the Texas Commission on Law Enforcement and, on information and belief, had completed the first aid and cardiopulmonary resuscitation training required for that license, including training on the recognition and relief of an obstructed airway in an unresponsive person.

***D. The EMS Response and Mr. Glenn's Death***

59. Texas City Fire Department Medic 20 arrived at approximately 11:40 a.m., roughly ten minutes after Adams' request and approximately eleven minutes after the stop began.

60. A paramedic asked Adams whether Mr. Glenn was breathing. Adams answered, "Barely." Adams' report states that the paramedics were "informed of what had transpired before their arrival."

61. The paramedics did not examine Mr. Glenn's airway on scene before placing him on a gurney and loading him into the back of Medic 20.

62. In the back of Medic 20, Mr. Glenn stopped breathing. At 11:43:32 a.m., dispatch logged "CPR started by EMS." Officers Pineda and Lizik assisted the paramedics in placing a mechanical chest-compression device on Mr. Glenn.

63. At approximately 11:53 a.m., still on scene in the back of Medic 20, a paramedic attempted to insert an endotracheal tube. The tube's camera showed a plastic bag obstructing Mr. Glenn's airway. Paramedics Neiman and Fregia removed the bag with forceps.

64. At 11:58:40 a.m., Medic 20 departed for HCA Houston Healthcare Mainland with chest compressions in progress.

65. At 12:12 p.m., hospital staff pronounced Mr. Glenn dead.

66. The bag removed from Mr. Glenn's airway contained approximately eighteen grams of a white rock-like substance that, according to the December 11, 2024 supplemental report of TCPD Investigator C. Ham, field-tested positive for cocaine and fentanyl.

67. At approximately 11:58 a.m., Picard telephoned TCPD Detective Sergeant Winstead and reported that Mr. Glenn had "experienced a medical emergency while in the custody of TCPD Officer Adams." The Chief's December 10, 2024 press release states that Mr. Glenn "was secured in hand restraints to investigate" and that the officer called EMS "because the male appeared to be in distress."

68. No criminal charge was filed against Mr. Glenn. TCPD closed the case as "exceptionally cleared" by reason of the death of the suspect.

***E. The Medical Examiner's Findings***

69. The Galveston County Medical Examiner performed an autopsy on December 11, 2024, Case No. ME-01-2024-958.

70. The Medical Examiner determined the cause of death to be "mechanical obstruction of airway by foreign body."

71. The Medical Examiner found no significant traumatic injuries and no lethal natural disease. The soft tissues of the neck were atraumatic and the hyoid bone and thyroid cartilage were intact.

72. The Medical Examiner's opinion states that Mr. Glenn "began to have trouble breathing and then became unresponsive," and that emergency medical services, "while attempting to intubate the decedent, removed a baggie containing white powdery material which was obstructing the decedent's larynx (airway)."

73. Postmortem toxicology detected phencyclidine and what the Medical Examiner described as "a low level of cocaine" in femoral blood, and a presumptive positive screen for naloxone. The Medical Examiner did not attribute the death to intoxication.

### *F. The City's Earlier Notice: The Death of Raven Vaughn in the Texas City Jail (2020)*

74. On February 10, 2020, TCPD Officer T. Hansen stopped a vehicle in the 3800 block of FM 1765 in Texas City and arrested its passenger, Raven Adriane Vaughn, age 29, on outstanding warrants and for possession of a controlled substance. TCPD Case No. 20-000915.

75. Officer Hansen's report states that he found in Mr. Vaughn's backpack "2 green diamond shaped pills, known to me by experience and training to be ecstasy (MDMA)," and that, after booking, he "weighed the suspected ecstasy at 0.4 grams" and "utilized a Nark II Methamphetamine/ MDMA field test kit and yielded a positive field test result."

76. Officer Hansen's report states that Mr. Vaughn "was transported, booked, and processed into the jail without incident." The TCPD reports produced to date

reflect no medical screening of Mr. Vaughn at intake and no inquiry into whether he had taken or ingested any substance.

77. At approximately 12:05 p.m. on February 11, 2020, jail staff placed Mr. Vaughn in the arraignment room with two other detainees, identified here as J.G. and C.V., to await the magistrate.

78. TCPD Detective Jeffrey Winstead interviewed J.G. and C.V. that afternoon and recorded their accounts in a supplemental report entered at 3:59 p.m. on February 11, 2020.

79. The supplement reports that C.V. "noticed that Vaughn started breathing heavy and that he began to sweat" before the magistrate arrived, and that Mr. Vaughn's "pupils became dilated and that his breathing became more labored."

80. The supplement reports that J.G. said Mr. Vaughn "began to have labored breathing and that he began to sweat," that "at one point Vaug[h]n removed his shirt and was wiping the sweat," and that his "skin was kind of red in color."

81. The supplement reports that C.V. said Mr. Vaughn "was having difficulty communicating with the judge," and that J.G. said Mr. Vaughn "was having problems communicating with the judge."

82. A jailer came to the arraignment room and asked Mr. Vaughn whether he was okay or needed medical attention. Mr. Vaughn told the jailer he was "OK," and the jailer removed him from the room.

83. At approximately 12:53 p.m., Detention Officer Crowel went to the arraignment room to escort the detainees back to their cells. According to the supplement of

TCPD Officer C. Ham, Detention Officer Crowel "saw that Vaughn was shaking and sweating profusely."

84. Detention Officer Crowel asked Mr. Vaughn "several times" whether he needed medical attention, accepted Mr. Vaughn's refusal, and placed him alone in Cell 6. Nothing in TCPD's reports indicates that any TCPD employee summoned EMS or any medical personnel at that time.

85. J.G. reported that he saw Mr. Vaughn "naked on the toilet" in his cell, that he later heard "banging noises" coming from Mr. Vaughn's cell, and that a jailer checked on Mr. Vaughn "at least three times during that time frame."

86. At approximately 1:23 p.m., according to Officer Ham's supplement, Detention Officer Crowel saw Mr. Vaughn "on the toilet in his cell, still shaking and sweating," asked again whether he needed medical attention, and again accepted a refusal.

87. At approximately 1:48 p.m., Detention Officer Crowel found Mr. Vaughn unresponsive and, for the first time recorded in TCPD's reports, requested EMS. Approximately fifty-five minutes had passed since Detention Officer Crowel first recorded that Mr. Vaughn was shaking and sweating profusely.

88. Texas City EMS transported Mr. Vaughn to Mainland Medical Center with CPR in progress. He was pronounced dead there shortly after 2:30 p.m.

89. In Custodial Death Report No. 20-213-MJ, amended and submitted to the Texas Office of the Attorney General on March 25, 2020, TCPD identified the cause of death as "[a]cute methamphetamine toxicity," citing Galveston County Medical

Examiner's report No. ME-01-2020-086, and identified Chief Joe Stanton as the agency's director.

90. The same Custodial Death Report answered "No" to whether Mr. Vaughn appeared intoxicated, and "Yes" to whether he exhibited medical problems and whether he exhibited mental health problems. Its narrative reproduces Officer Ham's supplement, including Detention Officer Crowel's observations that Mr. Vaughn was "shaking and sweating profusely" and, later, "still shaking and sweating."

91. On information and belief, TCPD did not adopt any new policy, training, or jail practice for recognizing and responding to signs of stimulant toxicity in detainees as a result of Mr. Vaughn's death.

***G. The City's Prior Notice: The Death of Rego Berto Ornelas Jr.***

92. On October 28, 2024, forty-three days before Mr. Glenn's death, TCPD officers responded to a 6:23 a.m. call reporting a man screaming at a closed City facility at 3301 Loop 197 North. Dispatch coded the event, Event ID 2024-586948, as "Suspicious Circ Person," priority 2, no medical priority.

93. Officers D. Moore and A. Parler found Rego Berto Ornelas Jr., age 45, who appeared to be under the influence of a substance. Officers reported him "resisting" at 6:37 a.m. and "in custody" at 6:41 a.m. He was handcuffed.

94. Officers Parler, McInerney, and Moore each reported that Mr. Ornelas told them that someone had given him something earlier. Officer Parler wrote that Mr. Ornelas "appeared to be drenched in sweat, which is a common side effect of

narcotics," and that he believed Mr. Ornelas "was under the influence of narcotics to the point where he was a danger to himself or others."

95. Officer G. Milillo's supplemental report states that, while officers waited for a patrol unit, he asked Mr. Ornelas "if he had taken anything and informed him to let officers know if he had so that EMS could be contacted if needed," and that Mr. Ornelas "advised that he had not taken anything." No officer requested EMS.

96. Sergeant Picard supervised the arrest by radio, retrieved a full-body restraint device to bring to the scene, and at 6:43:54 a.m. directed: "8140 take him straight south for resisting charge," meaning that Officer Moore was to transport Mr. Ornelas to the Galveston County Jail. Dispatch described Mr. Ornelas to the county jail as a "combative subject."

97. Officer Lizik was dispatched to the event at 6:38 a.m., went to the police department to retrieve the restraint device, was relieved of that task by Picard, and cleared at 6:43 a.m.

98. Mr. Ornelas was transported to the Texas City jail and then to the Galveston County Jail, arriving at 7:09 a.m. Jail staff refused to accept him and required a medical clearance for incarceration. At 7:21 a.m., Picard directed that Mr. Ornelas be transported to the University of Texas Medical Branch for that clearance.

99. At 7:36 a.m., a TCPD unit reported that CPR was in progress on Mr. Ornelas. At 7:38 a.m., Picard asked dispatch whether EMS was en route. Texas City dispatch called the county jail twice without answer and then called county dispatch, which reported at 7:40 a.m. that Galveston Police had EMS en route.

100. The City's dispatch log for the Ornelas event contains no request for emergency medical services by any TCPD officer at any time. At least seven TCPD units, including Picard and Lizik, were assigned to the event before Mr. Ornelas was transported.

101. Mr. Ornelas was pronounced dead at the University of Texas Medical Branch at 8:30 a.m.

102. The Galveston County Medical Examiner determined that Mr. Ornelas died of toxic effects of methamphetamine. Case No. ME-01-2024-826. The autopsy found a ruptured plastic bag in Mr. Ornelas's stomach and a rectal temperature of 107.5 degrees Fahrenheit on arrival at the hospital. Officer Moore's report states that while Mr. Ornelas sat in a restraint cart in the jail sally port he "appeared to be disoriented and delirious," would "throw his head back and flail his body around in the cart," and then "abruptly stopped"; Moore told Sergeant Picard she had noticed him "convulsing" moments before he stopped moving.

103. On December 12, 2024, two days after Mr. Glenn's death, TCPD Assistant Chief Manuel Johnson submitted the City's Custodial Death Report for Mr. Ornelas to the Office of the Attorney General, naming Chief Landis Cravens as the agency director. In that report the City stated that Mr. Ornelas had exhibited medical problems, had appeared intoxicated, was under restraint by handcuffs, and "was denied entry during booking and jail staff advised he required a medical fit for incarceration," after which "a medical episode happened."

104. On June 17, 2025, the TCPD Risk Analysis Board, chaired by Sergeant Jimmie Reynolds, reviewed the Ornelas in-custody death. The Board found that the officers' actions "were not a violation of policy" and recommended "no further action be taken." The Board's written disposition to Chief Cravens adds: "The board did note that EMS should have been called OR suspect should have been taken to a local hospital prior to going to the jail." The Board's worksheet bears the handwritten note: "EMS Should have been called or Transported to LOCAL Hospital."

105. The Board's disposition was transmitted to Chief Cravens and copied to Captains Kelemen, House, and Patterson and to Assistant Chief Johnson. On information and belief, no policy was changed, no training was ordered, and no officer was counseled or disciplined as a result of the Ornelas death.

106. Investigator C. Ham, Badge No. 2443, wrote the 2020 supplement reporting Detention Officer Crowel's observations of Mr. Vaughn, and on December 11, 2024 wrote the crime-scene supplement in this matter.

107. Detective Jeffrey Winstead, who in 2020 recorded the detainees' accounts of Mr. Vaughn's symptoms, was the Detective Sergeant to whom Picard reported Mr. Glenn's "medical emergency," and is listed as supervisor on the crime-scene supplement in this matter.

### *H. The City's Policies, Training, and Practice*

108. On information and belief, on December 10, 2024, and on October 28, 2024, the City had no written policy requiring a TCPD officer who observes or is told that a

detainee has swallowed a suspected narcotic, or who observes a detainee in respiratory distress or unresponsive, to treat the situation as a medical emergency, to examine and attempt to clear the detainee's airway, to begin resuscitation if breathing fails, or to transport the detainee to a medical facility rather than a jail.

109. On those dates, the City did not train TCPD officers to recognize and respond to an airway obstruction in a detainee who has swallowed an object, beyond whatever general first aid instruction accompanied their peace officer licenses, and did not train officers that a detainee who has ingested a substance and becomes unresponsive requires medical care rather than continued investigation or transport to jail.

110. On those dates, and on February 10 and 11, 2020, the City likewise had no policy and provided no training directing TCPD officers and jail personnel to treat the signs of acute stimulant toxicity, including profuse sweating, shaking or convulsive movement, flushed skin, dilated pupils, labored breathing, and impaired communication, as a medical emergency, or to treat a detainee who may have ingested a substance as at risk of a medical emergency regardless of the detainee's denial or refusal of help.

111. TCPD dispatch practice, as reflected in both the Ornelas and Glenn events, was to code an encounter with a person in apparent medical crisis as a "suspicious person" call with no medical priority, and not to reclassify it as a medical call when officers reported the person unconscious, combative and intoxicated, or refused by a jail for medical reasons.

112. The City's Chief of Police is responsible for the promulgation of TCPD general orders and training requirements. On information and belief, the City Commission of the City of Texas City has delegated to the Chief of Police final authority over TCPD policy, training, and internal review, and the Chief of Police exercised that authority at all relevant times.

113. Defendant Cravens was the Chief of Police on October 28, 2024 and on December 10, 2024. The Custodial Death Report for Mr. Ornelas names him as the agency director, and the Risk Analysis Board's disposition of the Ornelas death was addressed to him.

114. On information and belief, Chief Cravens was notified of Mr. Ornelas's death in TCPD custody on October 28, 2024, the day it occurred, and was informed within days that officers had transported Mr. Ornelas to a jail that refused him for medical reasons, and that no TCPD officer had requested emergency medical services.

115. In the forty-three days between Mr. Ornelas's death and Mr. Glenn's death, Chief Cravens did not adopt, direct, or announce any policy, general order, training, or instruction to TCPD officers concerning medical care for a detainee who has ingested a substance, who is in respiratory distress, or who is unresponsive, and did not direct that any such detainee be taken to a medical facility rather than to a jail.

116. The body-worn camera footage that the City produced to Mr. Glenn's family in response to their public information request was blurred across the entire frame for

the full duration of every recording. Unblurred originals exist in the City's Axon Evidence system.

## V. CLAIMS FOR RELIEF

**CLAIM I – Unreasonable Seizure – Fourth Amendment – 42 U.S.C. § 1983 (*Against Adams*)**

117. Plaintiffs repeat, reallege, and incorporate by reference each preceding paragraph as if fully set forth herein.

118. At all relevant times Defendant Adams acted under color of state law as a police officer of the City of Texas City.

119. Adams seized Mr. Glenn within the meaning of the Fourth Amendment when he activated his emergency lights, stopped his patrol unit behind Mr. Glenn, called Mr. Glenn to him, drew and pointed a Taser at him, ordered him to the ground, and handcuffed him, and Mr. Glenn submitted to that show of authority.

120. At the time Adams initiated the seizure, Adams had not observed Mr. Glenn commit any offense and had no specific, articulable facts supporting a reasonable suspicion that Mr. Glenn had committed, was committing, or was about to commit any offense. Mr. Glenn was walking on the left side of a roadway with no sidewalk, facing oncoming traffic, as Texas law directs.

121. The seizure of Mr. Glenn, including his detention at Taser point and his handcuffing while compliant, unarmed, and non-resisting, was unreasonable under the totality of the circumstances and violated his rights under the Fourth Amendment, applicable to the States through the Fourteenth Amendment.

122. The right to be free from an investigative stop and detention unsupported by reasonable suspicion was clearly established on December 10, 2024, and no reasonable officer in Adams' position could have believed that a pedestrian walking lawfully on the left side of a roadway without a sidewalk supplied reasonable suspicion of any offense.

123. As a direct and proximate result of the unlawful seizure, Mr. Glenn suffered the loss of his liberty, fear, humiliation, and physical pain, and was placed in the restraint and custody in which the events described above unfolded. Adams' own question, asked moments after the stop began, "What did you just swallow," reflects that an attempt by a stopped pedestrian to conceal contraband by swallowing it was a foreseeable consequence of the stop, and Plaintiffs plead in the alternative that Mr. Glenn's death was a proximate result of the unlawful seizure.

**CLAIM II – Deliberate Indifference to Serious Medical Needs – Fourteenth Amendment – 42 U.S.C. § 1983 (*Against Adams, Pineda, Picard, Stewart, and Lizik*)**

124. Plaintiffs repeat, reallege, and incorporate by reference each preceding paragraph as if fully set forth herein.

125. At all relevant times each Defendant named in this Claim acted under color of state law as a police officer or sergeant of the City of Texas City.

126. From the moment Adams handcuffed him, Mr. Glenn was in the custody of TCPD and was not free to leave. He had not been convicted of any offense. His right to medical care for a serious medical need while in custody arises under the Due

Process Clause of the Fourteenth Amendment. *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc).

127. Mr. Glenn's inability to breathe was a serious medical need. It was evident from his guttural sounds, his heaving, his inability to speak, his loss of consciousness, his incontinence, and the progressive fading of his breathing, and it was evident to each officer on scene, each of whom described it in his own report.

128. Defendant Adams knew that Mr. Glenn had placed an object in his mouth and swallowed it; asked him what he had swallowed; put his own finger into Mr. Glenn's mouth and found only residue, from which he knew the object had gone further down; heard Mr. Glenn's guttural, labored breathing; observed and recorded that Mr. Glenn displayed "signs of difficulty breathing"; observed that Mr. Glenn had soiled himself; observed that his breathing "became more shallow"; and told the paramedics that Mr. Glenn was breathing "barely." With that knowledge, Adams walked Mr. Glenn to his patrol unit, questioned him, searched his pockets, bagged the residue as evidence, and searched his belongings again, and did not at any time examine or attempt to clear Mr. Glenn's airway or begin resuscitation.

129. Defendant Picard knew from Adams' radio traffic before he arrived that Mr. Glenn had swallowed an unknown substance and that Adams had called for EMS; observed on arrival that Mr. Glenn was "breathing but unresponsive"; was told by Adams that Mr. Glenn had put something in his mouth and was having difficulty breathing; observed his breathing become "faint" and delayed; and recognized the

emergency well enough to radio dispatch to have EMS "step it up." As the supervising sergeant, Picard directed the removal of the handcuffs and nothing else. He did not examine or direct anyone to examine Mr. Glenn's airway, and did not begin or direct resuscitation.

130. Defendant Pineda knew from Adams' radio traffic that Mr. Glenn had swallowed something; observed on arrival that Mr. Glenn was "unconscious and struggling to breath"; observed him drooling, attempting to vomit, and incontinent; rubbed his sternum and received no response; and recognized the emergency well enough to radio dispatch that Mr. Glenn was unconscious and to have EMS "step it up." Pineda did not examine or attempt to clear Mr. Glenn's airway and did not begin resuscitation.

131. Defendant Stewart heard Adams' radio request for EMS "due to someone swallowing something"; observed on arrival that Mr. Glenn was "unconscious"; removed the handcuffs at Picard's direction so that the officers "could monitor Glenn's breathing"; and then monitored it. Stewart did not examine or attempt to clear Mr. Glenn's airway and did not begin resuscitation.

132. Defendant Lizik knew from Adams' radio traffic that Mr. Glenn "swallowed narcotics"; observed on arrival that Mr. Glenn was breathing faintly with a faint pulse; "stood by and continued to monitor"; and observed the breathing remain faint. Lizik did not examine or attempt to clear Mr. Glenn's airway and did not begin resuscitation.

133. Each Defendant named in this Claim was subjectively aware that Mr. Glenn faced a substantial risk of death from his inability to breathe, drew that inference, and disregarded the risk by failing to take the basic measures available to him and within his training: examining the airway, attempting to dislodge the obstruction, and beginning resuscitation when breathing failed, during the approximately fourteen minutes between the onset of Mr. Glenn's distress and the paramedics' assumption of his care.

134. Each Defendant's disregard of the risk was a proximate cause of Mr. Glenn's conscious suffering and of his death.

135. The right of a person in police custody to be free from an officer's deliberate indifference to an obvious, life-threatening medical need was clearly established on December 10, 2024, and a reasonable officer who watched a handcuffed detainee, known to have swallowed an object, progress from labored breathing to unconsciousness to faint breathing over fourteen minutes would have understood that doing nothing to address the airway violated that right.

136. In the alternative, to the extent the Court determines that the events described above occurred in the course of an ongoing Fourth Amendment seizure rather than in custodial detention, the same conduct constituted an objectively unreasonable denial of medical care in violation of the Fourth Amendment.

**CLAIM III – Municipal Liability – 42 U.S.C. § 1983 (*Against the City of Texas City*)**

137. Plaintiffs repeat, reallege, and incorporate by reference each preceding paragraph as if fully set forth herein.

138. The violations of Mr. Glenn's constitutional rights described in Claim II were caused by official policies and customs of the City of Texas City, adopted and maintained with deliberate indifference to the rights of persons in TCPD custody. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).

139. The City's final policymaker for TCPD policy, training, and internal review is the Chief of Police, acting under authority delegated by the City Commission, and, to the extent that authority was not delegated, the City Commission itself.

140. Three people died in TCPD custody between February 2020 and December 2024: Raven Vaughn on February 11, 2020; Mr. Ornelas on October 28, 2024; and Mr. Glenn on December 10, 2024.

141. Mr. Vaughn and Mr. Ornelas died of the same cause, toxic effects of methamphetamine, as determined by the Galveston County Medical Examiner in Case Nos. ME-01-2020-086 and ME-01-2024-826. Mr. Glenn died of mechanical obstruction of the airway by a foreign body, Case No. ME-01-2024-958.

142. In each death, TCPD personnel observed visible and worsening signs of a medical emergency while the detainee was in TCPD's custody: Mr. Vaughn shaking and sweating profusely for nearly an hour; Mr. Ornelas drenched in sweat, answering incoherently, throwing his body about the patrol unit and the restraint cart, and convulsing, over the fifty-five minutes between his arrest and the start of CPR; and

Mr. Glenn laboring to breathe and then losing consciousness over fourteen minutes.

143. In each death, TCPD personnel had reason to suspect that the detainee had taken a substance. Mr. Glenn was seen placing an object in his mouth. Mr. Ornelas told three officers that someone had given him something earlier. Mr. Vaughn was arrested with pills that Officer Hansen believed to be ecstasy and that produced a positive result on a Nark II methamphetamine/MDMA field test.

144. In each death, the first actions TCPD personnel took toward the detainee were to hold Mr. Vaughn in a cell, to transport Mr. Ornelas to jail and then to await a restraint device, and to question and search Mr. Glenn, and in none of the three did any TCPD employee examine the detainee or request medical care until he was unresponsive.

145. Absence of policy and failure to train. The City maintained no policy and provided no training directing TCPD officers to treat a detainee's ingestion of a suspected narcotic, respiratory distress, or unresponsiveness as a medical emergency requiring immediate examination and clearance of the airway, resuscitation if breathing fails, and transport to medical care rather than to jail. The need for such a policy and training was obvious in light of the frequency with which TCPD officers encounter persons who ingest contraband during stops and persons who are intoxicated or in medical crisis at arrest, and the highly predictable consequence of its absence was that a detainee in Mr. Glenn's position would die while officers waited for EMS. *City of Canton v. Harris*, 489 U.S. 378, 390

(1989). The need was made plain to the City by Mr. Vaughn's death in 2020 and by Mr. Ornelas's death forty-three days earlier.

146. Custom. The City's actual practice, as reflected in the deaths of Mr. Vaughn in February 2020, Mr. Ornelas in October 2024, and Mr. Glenn in December 2024, in the dispatch coding of the Ornelas and Glenn events as non-medical "suspicious person" calls that were never reclassified, and in the involvement of the same supervising sergeant in both 2024 deaths, was to treat a detainee's visible medical crisis, particularly one following suspected substance ingestion, as a matter of custody and investigation rather than medical care, and to defer all medical assessment and intervention to EMS or to a jail regardless of the detainee's condition. That practice persisted over a period of more than four years and was so common and well settled among TCPD personnel as to constitute a custom that fairly represents municipal policy.

147. The Vaughn and Ornelas deaths are similar in the respects that matter. Each involved a detainee in TCPD custody, visible profuse sweating recorded by TCPD's own personnel, a suspicion of drug use, no summons for emergency care while the detainee was conscious, and a death from the same cause, toxic effects of methamphetamine.

148. Policymaker knowledge. The City's Chief of Police had notice of the Vaughn death no later than March 25, 2020, when the City submitted its amended Custodial Death Report to the Office of the Attorney General, naming Chief Joe Stanton as director and reciting the cause of death as acute methamphetamine

toxicity. By December 12, 2024, the Chief of Police and his Assistant Chief had certified to the State of Texas that officers had observed medical problems in a restrained, intoxicated detainee, Mr. Ornelas, and transported him to jail, where he was refused for medical reasons and then died. On June 17, 2025, the City's Risk Analysis Board found that conduct to be no violation of policy while acknowledging that EMS should have been called or the detainee taken to a hospital. That finding was transmitted to the Chief of Police and, on information and belief, was not overruled and produced no change in policy or training. The City's disposition of the Vaughn and Ornelas deaths confirms that the absence of any policy requiring medical care for a detainee in crisis was the City's deliberate choice and not the oversight of an individual officer.

149. The City's absence of policy, failure to train, and custom described above were the moving force behind the officers' failure to examine, clear, or resuscitate Mr. Glenn's airway, and a proximate cause of his death.

**CLAIM IV – Supervisory Liability – Fourteenth Amendment – 42 U.S.C. § 1983 (*Against Cravens*)**

150. Plaintiffs repeat, reallege, and incorporate by reference each preceding paragraph as if fully set forth herein.

151. At all relevant times Defendant Cravens acted under color of state law as Chief of Police of the City of Texas City.

152. As Chief of Police, Cravens was responsible for the training and supervision of TCPD officers and for the promulgation of the general orders that govern their conduct toward persons in custody, including the provision of medical care.

153. Cravens had actual notice, from Mr. Ornelas's death on October 28, 2024, that TCPD officers confronted with a detainee showing signs of a medical emergency after suspected drug ingestion had treated the situation as a matter of custody and transport rather than medical care, had not requested emergency medical services, and had delivered the detainee to a jail that refused him on medical grounds, after which he died.

154. With that notice, Cravens took no action in the forty-three days that followed. He adopted no policy, ordered no training, and issued no instruction directing officers to treat a detainee's suspected ingestion, respiratory distress, or unresponsiveness as a medical emergency requiring examination of the airway, resuscitation if breathing fails, and immediate transport to medical care.

155. The need for such a policy, training, and instruction was obvious to Cravens in light of Mr. Ornelas's death, the frequency with which TCPD officers encounter persons who ingest contraband during stops and persons in medical crisis at arrest, and the likelihood that a detainee in that condition would die while officers waited for EMS. Cravens's failure to act in the face of that need constituted deliberate indifference to the rights of persons in TCPD custody.

156. Cravens's failure to train, supervise, and direct TCPD officers was a cause of the officers' failure to examine, clear, or resuscitate Mr. Glenn's airway on December 10, 2024, and a proximate cause of Mr. Glenn's death.

157. The right of a person in police custody to receive medical care for an obvious, life-threatening medical need, and the liability of a supervisor whose deliberate indifference to the need for training and policy causes that right to be violated, were clearly established on December 10, 2024.

158. This Claim is pleaded against Cravens in his individual capacity and in addition to, and in the alternative to, Claim III against the City under Federal Rule of Civil Procedure 8(d).

## VI. DAMAGES

159. Plaintiffs repeat, reallege, and incorporate by reference each preceding paragraph as if fully set forth herein.

160. Under 42 U.S.C. § 1988(a), the survivorship and wrongful death provisions of Texas law, Tex. Civ. Prac. & Rem. Code §§ 71.002 through 71.004 and § 71.021, govern who may recover, and what may be recovered, for Mr. Glenn's death under 42 U.S.C. § 1983. *Robertson v. Wegmann*, 436 U.S. 584, 588 to 590 (1978).

161. Survival damages. The Estate of Derrick Dwayne Glenn is entitled to recover the damages Mr. Glenn himself sustained before his death, including conscious physical pain and suffering and mental anguish during the approximately forty-three minutes between the onset of his respiratory distress and his death, medical expenses, and funeral and burial expenses.

162. Wrongful death damages. Patricia Glenn, as Mr. Glenn's surviving parent, and Kayla Glenn and Deniah Glenn, as his surviving children, are the statutory wrongful death beneficiaries of Derrick Dwayne Glenn. Mr. Glenn was never married and left no surviving spouse. Each is entitled to recover for the loss of Mr. Glenn's companionship and society, for mental anguish, and for the loss of the financial support, services, and advice he would have provided, in amounts to be determined at trial.

163. Exemplary damages. The conduct of Defendants Adams, Pineda, Picard, Stewart, Lizik, and Cravens described above was undertaken with reckless and callous indifference to Mr. Glenn's federally protected rights, entitling Plaintiffs to an award of exemplary damages against each of them in his individual capacity under 42 U.S.C. § 1983. No exemplary damages are sought against the City.

## VII. ATTORNEYS' FEES

164. Plaintiffs are entitled to recover their reasonable attorneys' fees, expert fees, and costs under 42 U.S.C. § 1988(b) and (c).

## VIII. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable under Federal Rule of Civil Procedure 38(b).

## REQUEST FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that Defendants be cited to appear and answer, and that upon final trial Plaintiffs have judgment against Defendants for:

a. compensatory damages on behalf of the Estate of Derrick Dwayne Glenn for Mr. Glenn's conscious pain and suffering, mental anguish, medical expenses, and funeral and burial expenses;

b. compensatory damages on behalf of Patricia Glenn, Kayla Glenn, and Deniah Glenn for loss of companionship and society, mental anguish, and loss of support, services, and advice;

c. exemplary damages against Defendants Adams, Pineda, Picard, Stewart, Lizik, and Cravens in their individual capacities;

d. reasonable attorneys' fees, expert fees, and costs under 42 U.S.C. § 1988;

e. pre-judgment and post-judgment interest at the highest rates allowed by law;

f. costs of court; and

g. such other and further relief, at law or in equity, to which Plaintiffs may show themselves justly entitled.

Date: October 28, 2026

Respectfully submitted,

/s/ Courtney A. Vincent
**Courtney A. Vincent**
Minnesota Bar No.: 0403083
SDTX Bar No.: 3746531
***Vincent Civil Rights – a Division of Vincent Law, PLLC***
1035 Dairy Ashford, Suite 145
Houston, Texas 77079
**Mailing Address:**
P.O. Box 940129
Houston, Texas 77094
Tel: (713) 223-9300
Fax: (832) 603-4444
**info@vincentlawpllc.com**

/s/ Adalberto E. Ruiz
**Adalberto E. Ruiz**
Texas Bar No.: 24071767
SDTX Bar No.: 2925292
***The Ruiz Law Firm, PLLC***
3718 E. Broadway St.
Pearland, Texas 77581
Tel: (832) 744-8650
**alberto@ruizlawyer.com**

**ATTORNEYS FOR PLAINTIFFS**